J-A01002-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: K.A.R.J., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: M.J., MOTHER | |
| | No. 2161 EDA 2018 |

Appeal from the Decree Entered June 21, 2018
In the Court of Common Pleas of Philadelphia County
Family Court at No(s):  CP-51-AP-0001266-2016,
FID: 51-FN-001981-2014

BEFORE:  OTT, J., STABILE, J., and McLAUGHLIN, J.

MEMORANDUM BY OTT, J.:                         **FILED MARCH 26, 2019**

Appellant, M.J. ("Mother"), appeals from the decree entered on June 21, 2018, in the Court of Common Pleas of Philadelphia County, involuntarily terminating her parental rights to her daughter, K.A.R.J. ("Child"), born in January of 2011.[1]  Upon careful review, we affirm.

In its Rule 1925(a) opinion, the trial court thoroughly set forth the factual and procedural history of this case, which the record evidence supports.  As such, we adopt the court's findings herein.  **See** Trial Court Opinion, 9/19/18, at 1-5.

By way of background, the Philadelphia Department of Human Services ("DHS") became involved with this family in April of 2014, upon receiving a

---

[1] The trial court terminated the parental rights of Child's father, C.A., and of any unknown father, by decree dated May 31, 2017.  Trial Court Opinion, 9/19/18, at 2, n. 3.  Father is not involved in the instant appeal.

report alleging that Mother was unable to provide for Child and her older brother, C.J., who is not a subject of this appeal. *Id.* at 1. Specifically, the report alleged that Mother had been unemployed since 2012; Mother's home was in foreclosure; the water service in Mother's home had been disconnected; there was limited food in the home; and Mother was suffering from depression. *Id.* DHS substantiated the report, and the Community Umbrella Agency ("CUA") implemented in-home services. *Id.*

On September 22, 2014, the trial court adjudicated Child dependent. *Id.* at 2. Child remained in Mother's physical custody with DHS supervision. *Id.* The CUA established Single Case Plan ("SCP") objectives for Mother which included maintaining housing; obtaining employment; participating in parenting classes; obtaining a parenting capacity evaluation; participating in mental health services; attending supervised visits with Child; and maintaining contact with the CUA. N.T., 6/21/18, at 20-21.

On September 21, 2015, the trial court placed Child in the physical custody of DHS. Trial Court Opinion, 9/19/18, at 3. Thereafter, permanency review hearings occurred at regular intervals, and the trial court found at each hearing that Mother was minimally compliant with her SCP objectives. *Id.* at 3-4.

On December 22, 2016, DHS filed petitions for the involuntary termination of Mother's parental rights to Child and C.J., her older brother. Trial Court Opinion, 9/19/18, at 4. Following a hearing, by decree dated May

31, 2017, the trial court terminated Mother's parental rights to Child and C.J.,[2] and Mother filed a notice of appeal and a concise statement of errors complained of on appeal with respect to Child only. *Id.* at 1, n. 2. By order dated January 25, 2018, this Court reversed the decree and remanded the case.[3]

Thereafter, on February 9, 2018, upon request of the Child Advocate, Judge Younge issued an order finding that aggravated circumstances existed as to Mother, due to the termination of her parental rights to C.J., and no efforts were to be made to reunify Mother and Child. Trial Court Opinion, 9/19/18, at 4.

On remand, on March 2, 2018, DHS filed an amended petition for the involuntary termination of Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). While the termination hearing was pending, a permanency review hearing was held before Judge Younge on April 26, 2018, which resulted in an order permitting visitation between Child and Mother if "therapeutically recommended and at Child's discretion." Trial Court Opinion, 9/19/18, at 4.

_____

[2] The Honorable Lyris Younge presided over the termination proceeding. She remained the assigned judge in the underlying matter through April 26, 2018. Trial Court Opinion, 9/19/18, at 4, n. 5.

[3] This Court issued its order as a result of the motion filed by the Child Advocate and DHS, in lieu of appellee briefs, to remand the case for a new involuntary termination hearing.

The termination hearing on the amended petition occurred on June 21, 2018,[4] during which DHS presented the testimony of Carol Robinson, the CUA caseworker assigned to this family since February 3, 2017, and William F. Russell, Ph.D., who performed a parenting capacity evaluation. Mother testified on her own behalf.[5]

Ms. Robinson testified that Child, then age seven, had been in four separate foster care placements since her removal from Mother in September of 2015. N.T., 6/21/18, at 14. Child had been in her current kinship treatment care placement since May of 2017, and, on June 11, 2018, she told Ms. Robinson she would like to stay there long-term. *Id.* at 14, 76. At the time of the hearing, Child had been in weekly mental health therapy for more than two years, and Ms. Robinson testified that Child's mental health has stabilized. *Id.* at 18-19, 75.

---

[4] The Honorable Joseph Fernandes presided over the subject proceeding.

[5] During the involuntary termination proceeding, a Child Advocate represented Child's legal interests, and a guardian *ad litem* ("GAL") represented her best interests. *See In re T.S.*, 192 A.3d 1080 (Pa. 2018) (citing *In re Adoption of L.B.M.*, 161 A.3d 172 (Pa. 2017)) (stating that, pursuant to 23 Pa.C.S. § 2313(a), a child who is the subject of a contested involuntary termination proceeding has a statutory right to counsel who discerns and advocates for his or her legal interests, which our Supreme Court has defined as the child's preferred outcome). At the conclusion of the testimonial evidence, the Child Advocate and the GAL argued on the record and in open court for the involuntary termination of Mother's parental rights. N.T., 6/21/18, at 127-132.

With respect to Mother's SCP goals, Ms. Robinson testified that, "In essence, [Mother] completed employment,[6] housing,[7] financial counseling, and parent education." N.T., 6/21/18, at 21. However, Mother did not satisfy her objectives regarding visitation and mental health. *Id.* at 21-22, 25-27, 64-65.

By decree dated and entered on June 21, 2018, the trial court involuntarily terminated Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (8), and (b). Mother timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The trial court filed its Rule 1925(a) opinion on September 19, 2018.

Mother raises the following issues for our review:

1. Whether the trial court erred in terminating [Mother's] parental rights under 23 Pa.C.S.A. [§] 2511(a)(1), the evidence having been insufficient to establish Mother had evidenced a settled purpose of relinquishing parental claim, or having refused or failed to perform parental duties[?]

2. Whether the evidence was sufficient to establish that [Mother] had refused or failed to perform parental duties, caused

_____

[6] Ms. Robinson testified that Mother has been employed full-time since April of 2016. N.T., 6/21/18, at 29.

[7] Mother entered into a lease for an apartment in February of 2018. *Id.* at 33. Ms. Robinson visited the apartment on June 20, 2018, the day before the subject proceeding, at which time she questioned whether Mother "really live[d] there." *Id.* at 39, 74. She described observing Mother's unmade bed with unpacked bedding in the bedroom. *Id.* at 34-36.

Child to be without essential parental care, that conditions having led to placement had continued to exist, or finally that any of the above could not have been remedied[?]

3. Whether the evidence was sufficient to establish that termination of parental rights would best serve the needs and welfare of the minor child, under 23 Pa.C.S. [§] 2511(b)[?]

Mother's brief at 5 (unnecessary capitalization omitted).[8]

We review this appeal according to an abuse of discretion standard, as follows.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because

---

[8] Mother's counsel asserted during oral argument before this Court that the trial court erred or abused its discretion in permitting the Child Advocate to state Child's preferred outcome of this matter. However, Mother neither raised this issue in her concise statement of errors complained of on appeal, nor set it forth or suggested it in the statement of questions involved in her brief. *See Krebs v. United Refining Company of Pennsylvania*, 893 A.2d 776, 797 (Pa. Super. 2006) (stating, "We will not ordinarily consider any issue if it has not been set forth in or suggested by an appellate brief's statement of questions involved, Pa.R.A.P. 2116(a), and any issue not raised in a statement of matters complained of on appeal is deemed waived.") (citation omitted).

In her concise statement, Mother asserts that the court erred in not allowing Child to testify during the termination hearing and in permitting the CUA caseworker to testify regarding Child's out-of-court declarations. Because Mother does not set forth these issues or suggest them in the statement of questions involved in her brief, they are also waived on appeal. *See Krebs*, *supra*; Pa.R.A.P. 2116(a) ("No question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby.")

the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Instantly, we conclude that the certified record supports the decree pursuant to Section 2511(a)(1) and (b), which provides as follows.

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

. . .

- 7 -

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (b); *see also In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*) (stating that we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm).[9]

With respect to Section 2511(a)(1), "the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." *In re Z.S.W.*, 946 A.2d 726, 730 (Pa. Super. 2008) (citation omitted).

It is well-established that "Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child and refusal or failure to perform parental duties. Accordingly, parental rights

---

[9] Based on this disposition, to the extent Mother argues in her second issue that the trial court abused its discretion in terminating her parental rights pursuant to Section 2511(a)(8), we need not review that issue.

may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child <u>or</u> fails to perform parental duties." ***In re Adoption of Charles E.D.M.***, 708 A.2d 88, 91 (Pa. 1998) (emphasis in original) (citation omitted).  In addition,

> [T]he trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

***In re N.M.B.***, 856 A.2d 847, 854-855 (Pa. Super. 2004) (citations omitted).

Our Supreme Court has explained that parental duty "is best understood in relation to the needs of a child." ***In re Burns***, 379 A.2d 535, 540 (Pa. 1977).

> A child needs love, protection, guidance, and support.  These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child.  Thus, this Court has held that the parental obligation is a positive duty which requires affirmative performance.  This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.  Because a child needs more than a benefactor, parental duty requires that a parent 'exert himself to take and maintain a place of importance in the child's life.'

***Id.*** (citations omitted).

We have stated that the court must next consider "the parent's explanation for his or her conduct" and "the post-abandonment contact between parent and child" before moving on to analyze Section 2511(b). ***In re Z.S.W.***, ***supra*** (quoting ***In re Adoption of Charles E.D.M.***, ***supra*** at 92).

With respect to Section 2511(b), this Court has stated, "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). Further, the trial court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* (citation omitted). However, "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-763 (Pa. Super. 2008) (citation omitted).

In this appeal, Mother argues that DHS did not meet its evidentiary burden under Section 2511(a)(1). Mother asserts that she was consistent with her supervised visitation with Child for six months immediately preceding the filing of the first termination petition on December 22, 2016. Mother then argues that, to the extent she failed to visit with Child from January 25, 2018, when this Court reversed the May 31, 2017 decree and remanded the case, to March 2, 2018, when DHS filed an amended termination petition, it was less than the requisite six-month time-period. The testimonial evidence belies Mother's claim.

Ms. Robinson testified that, from November of 2015, soon after the court removed Child from Mother, through the first termination proceeding on May

31, 2017, Mother attended 50 out of 82 weekly one-hour supervised visits with Child. N.T., 6/21/18, at 64-65. In addition, Ms. Robinson testified that she offered Mother additional visits at unspecified times, but Mother declined them. *Id.* at 69-70. Further, she observed that Mother had limited interaction with Child during the visits, and that Mother was consistently "on the phone during visits." *Id.* at 40-42. She testified that Mother never brought dinner or snacks to the visits, which occurred from 6:00 p.m. to 7:00 p.m. *Id.* at 41. Mother's last supervised visit with Child was on May 30, 2017, and it lasted for one-half hour because Mother had to leave for an appointment. *Id.* at 68. Mother never attempted to reschedule that visitation so that she could spend a full one-hour visit. *Id.* at 69. Moreover, DHS never increased her visits or permitted them to be unsupervised, and Mother never requested that it do so. *Id.* at 65. Based on the foregoing, we disagree with Mother that she satisfactorily met her FSP goal regarding visitation at the time of the first termination hearing.

Thereafter, from the time of the first hearing on May 31, 2017, through the second hearing on June 21, 2018, the testimonial evidence reveals that Mother never visited with Child; asked how Child is; asked about Child's therapeutic needs; asked to attend Child's medical appointments and school conferences; sent cards or gifts to Child; or contacted Child by telephone. *Id.* at 42-43, 72-73.

Mother asserts that she was not afforded supervised visits after the issuance of the May 31, 2017 decree up through the April 26, 2018 permanency order, discussed above, which permitted visits upon a therapist's recommendation and at Child's discretion. Mother asserts that the record does not include a therapeutic recommendation for visits. Mother's counsel stated on the record during the subject hearing that he filed a subpoena for documents from the therapist, who we presume was Child's therapist, but the therapist had not yet complied. N.T., 6/21/18, at 46. However, Mother does not assert, and the record does not demonstrate, that she requested from Child's therapist a recommendation for supervised visitation to resume. In addition, Ms. Robinson testified that she would have offered Mother an unspecified number of additional visits after the May 31, 2017 termination decree, but "she did not want any additional visits." *Id.* at 70. Further, Ms. Robinson testified that Mother never contacted her at the CUA after the first termination hearing. *Id.* at 29-30, 74.

Ms. Robinson testified that, in April of 2018, subsequent to the above-mentioned permanency order, Child telephoned Mother and spoke to her for two hours. *Id.* at 43. Child telephoned Mother more than once after that, but Mother did not answer or return her calls. *Id.* at 44, 50. On June 20, 2018, when Ms. Robinson visited Mother to assess her apartment, Mother stated that her attorney advised her not to speak to Child because there was

a no-contact order.[10] *Id.* at 45. However, counsel for DHS and the Child Advocate stated on the record and in open court that a no-contact order did not exist in this case. *Id.* at 46. In addition, Ms. Robinson testified that Mother did not contact the CUA after Child placed the telephone calls to inquire whether Mother may speak to Child. *Id.* at 51. Ms. Robinson stated that, if Mother had inquired about this, she would have told her, "it's not a problem." *Id.*

Based on the foregoing, as well as the totality of the record evidence, we discern no abuse of discretion by the trial court pursuant to Section 2511(a)(1). The record demonstrates that Mother refused or failed to perform her parental duties from September of 2014, when Child was adjudicated, through the subject proceedings. Mother has maintained no more than a mere passive interest in Child during this significant time period in Child's life, and she did not exert herself to take or maintain a place of importance in Child's life even after this Court reversed the May 31, 2017 decree and remanded the case. Therefore, Mother's first issue fails.

With respect to Section 2511(b), Mother asserts that there is no evidence regarding the bond, if any, between Child and Mother. In the alternative, she asserts that there is no evidence of what bond "could possibly

---

[10] Mother's counsel confirmed on the record in open court that he advised Mother not to have any contact with Child "because it would be . . . contravening the order." N.T., 6/21/18, at 46, 48.

have been rekindled if physical contact were to be allowed to have occurred."

Mother's brief at 20. We disagree.

In analyzing the decree pursuant to Section 2511(b), the following case law is relevant.

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child. *In re K.K.R.S.*, 958 A.2d 529, 533-536 (Pa. Super. 2008). The mere existence of an emotional bond does not preclude the termination of parental rights. *See In re T.D.*, 949 A.2d 910 (Pa. Super. 2008) (trial court's decision to terminate parents' parental rights was affirmed where court balanced strong emotional bond against parents' inability to serve needs of child). Rather, the orphans' court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." *In re Adoption of T.B.B.*, 835 A.2d 387, 397 (Pa. Super. 2003). As we explained in *In re A.S.*, 11 A.3d 473, 483 (Pa. Super. 2010),
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011).

Furthermore, our Supreme Court has stated, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, *supra* at 268. The Court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the

ticking clock of childhood ever in mind." *Id.* at 269. The *T.S.M.* Court observed, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

Instantly, the trial court concluded that Child, then age seven, "does not have a healthy, necessary, or beneficial parent-child bond with Mother." Trial Court Opinion, 9/13/18, at 14. The court found that Child's relationship with Mother is like that of an aunt and niece. *Id.* Ms. Robinsons' testimony supports the court's findings. *See* N.T., 6/21/18, at 74-75.

> On cross-examination by the GAL, Ms. Robinson testified:
>
> Q. And when you've spoken to [Child] as recently as the spring, since the April order about visits was entered this year, and you've asked about visiting with her mother, what has she indicated to you?
>
> A. She wouldn't mind seeing her mom, but, . . . just for a visit, but she's coming back home.
>
> Q. And when she says coming back home, what does that mean?
>
> A. She was referring to her foster home.

*Id.* at 75-76. Indeed, Child has informed Ms. Robinson that she prefers to stay long-term with her kinship parents. *Id.*

> Ms. Robinson further testified:
>
> Q. At one point recently when you asked [Child] about seeing her mother again, she mentioned that she'd like to see her in order to play with her phone?
>
> A. Yes.

Q. And why is that, do you believe?

A. She's a kid. They like to play on the phone with video games and . . . stuff.

*Id.* at 70.

Ms. Robinson testified that, based on her monthly observations of Child in the kinship home, where she has resided since May of 2017, Child shares a parent-child bond with her kinship parents.[11] *Id.* at 53-54, 77. The kinship parents meet Child's developmental, physical, emotional, and special mental health needs. *Id.* at 76. Child's mental health has stabilized, although she still receives weekly therapy. *Id.* at 18, 75. Ms. Robinson testified that Child will not suffer irreparable harm if Mother's parental rights are terminated. *Id.* at 75. Based on the foregoing, we discern no abuse of discretion by the trial court in concluding that Child's developmental, physical, and emotional needs and welfare necessitate the involuntary termination of Mother's parental rights. Accordingly, we affirm the decree pursuant to 23 Pa.C.S. § 2511(a)(1) and (b).

Decree affirmed.

Judge Stabile joins this memorandum. Judge McLaughlin files a concurring memorandum statement.

---

[11] The certified record does not specify the particular family relationship of the kinship parents and Child.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>3/26/19</u>